R. GAYLORD SMITH, State Bar No. 72726
MALISSA HATHAWAY MCKEITH, State Bar No. 112917
MICHAEL K. JOHNSON, State Bar No. 130193
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
650 Town Center Drive, Suite 1400
Costa Mesa, CA   92626
Tel:   (714) 545-9200
Fax:   (714) 850-1030
Email:   smith@lbbslaw.com
          mckeith@lbbslaw.com
          johnsonm@lbbslaw.com

Attorneys for Defendant
SQM NORTH AMERICA CORPORATION

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF POMONA, | CASE NO. 2: 11-cv-00167-RGK (VBKx) |
| Plaintiff, | Hon. R. Gary Klausner |
| v. | **DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)** |
| SQM   NORTH   AMERICA CORPORATION, | |
| Defendant. | **Pre-Trial:   January 3, 2012** **Trial Date:  January 10, 2012** |

4838-5611-7518.1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

I.     PLAINTIFF'S CLAIMS ................................................................... 1

    A.     **Summary of Claim and Elements** ..................................... 1

    B.     **Summary of Evidence Opposing Plaintiff's Case in Chief** ............. 3

        1.     **Product Identification (Request for FRE 402 Hearing)** .......... 3

        2.     **No Defect** .................................................................... 5

        3.     **Consumer Expectation Test** ........................................ 7

        4.     **Risk-Benefit Test** ....................................................... 8

        5.     **"Harm" – Economic Loss Not Recoverable** ................ 10

II.    AFFIRMATIVE DEFENSES ......................................................... 11

    A.     **Statute of Limitations** ..................................................... 11

        1.     Summary Statement ...................................................... 11

        2.     Elements and Key Evidence ........................................ 11

    B.     **Standing** ....................................................................... 12

        1.     Summary Statement ...................................................... 12

        2.     Elements and Key Evidence ........................................ 12

    C.     **The Economic Loss Rule Bars Plaintiff's Claims** .............. 13

        1.     Summary Statement ...................................................... 13

        2.     Elements and Key Evidence ........................................ 13

    D.     **United States Approval, Pre-emption and Sophisticated User** ....... 15

        1.     Summary Statement ...................................................... 15

        2.     Elements and Key Evidence ........................................ 15

    E.     **Superseding Cause/ Lack of Foreseeability** ...................... 16

        1.     Summary Statement ...................................................... 16

        2.     Elements and Key Evidence ........................................ 16

///
///
///

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1

**F.   Comparative Negligence** ........................................................ 17

    **1.**   Summary Statement ......................................................... 17

    **2.**   Elements and Key Evidence ........................................... 17

**III.   ANTICIPATED EVIDENTIARY ISSUES** ................................... 18

    **1.   Striking of Experts.** ....................................................... 18

    **2.   FRE 403 Hearing on *Daubert* Objections.** ............................. 18

**IV.   IDENTIFICATION OF ISSUES OF LAW** .................................. 19

    **1.   Motions in Limine** ......................................................... 19

    **2.   Statute of Limitations** ................................................... 19

    **3.   Economic Loss Rule** ...................................................... 20

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Aas v. Superior Court*
(2000) 24 Cal.4th 627 ................................................................................. 1, 10, 13, 14

*Aerojet-General Corp. v. Super. Ct.*
(1989) 211 Cal.App.3d 216 ....................................................................................... 14

*American Insurance Association v. Garamendi*
(2003) 537 U.S. 1100 .......................................................................................... 15, 16

*Arena v. Owens-Corning Fiberglas Corp.*
(1998) 63 Cal.App.4th 1178 ....................................................................................... 6

*California Department of Toxic Substances Control v. Payless Cleaners*
(E.D. Cal.) 2007 WL 2580626 ........................................................................... 10, 13

*Casden Builders v. Entre Prises USA, Inc.*
2010 U.S.Dist LEXIS 82423 (C.D. Cal.) .................................................................. 14

*County of Santa Clara v. Atlantic Richfield Co.*
(2006) 137 Cal.App.4th 292 .................................................................... 10, 13, 14, 15

*Davies v. Krasna*
(1975) 14 Cal. 3d 502 ............................................................................................... 11

*Elmore v. American Motors Corp.*
(1969) 70 Cal.2d 578, 586 ......................................................................................... 13

*Ford v. Miller Meat Company*
(1994) 28 Cal.App.4th 1196 ....................................................................................... 6

*Harris v. Costco Wholesale Corp.*
2011 U.S. Dist. LEXIS 5406 (N.D.CA. 2011) ........................................................... 6

*Johnson v. American Standard, Inc.*
(2008) 43 Cal.4th 56 ................................................................................................. 15

*Mexicali Rose v. Superior Court*
(1992) 1 Cal.4th 617 ................................................................................................... 6

*Molly Stearns v. Select Comfort Retail Corporation*
763 F. Supp.2d 1128 (N.D.Cal. 2010). ..................................................................... 14

*Morson v. Superior Court*
(2001) 90 Cal.App.4th 77 ........................................................................................... 6

*Nabors v. Google, Inc.*
2011 U.S. Dist LEXIS 97924 at *21-*22 (N.D. Cal.) .............................................. 14

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Nelson v. Indevus Pharmaceuticals, Inc.*
    (2006) 142 Cal.App.4th 1202 ........................................................................11

*Nelson v. Superior Court*
    (2006) 144 Cal.App.4th 689.,………………………………………………12, 13

*Pannu v. Land Rover North America, Inc.*
    (2011) 191 Cal.App.4th 1298 ..........................................................................2

*Pennsylvania v. Nelson*
    350 U.S. 497 (1956) ........................................................................................15

*Seely v. White Motor Co.*
    (1965) 63 Cal.2d .............................................................................................14

*Soule v. General Motors Corp.*
    (1994) 8 Cal.4th 548 .........................................................................................2

*State v. Super. Ct. of Riverside County*
    (2000) 78 Cal.App.4th 1019 ...........................................................................14

*Torres v. Taser Int'l, Inc.*
    277 Fed. Appx. 684 2008 U.S. App. LEXIS 10169 (9th Cir. Cal. 2008).......13

*Wilshire Westwood Assoc. v. Atlantic Richfield Co.*
    (1993) 20 Cal.App.4th 732 .............................................................................11

*Zamora v. Shell Oil Co.*
    (1997) 55 Cal.App.4th 204 .............................................................................13

## STATUTES

California Code of Civil Procedure §338(b) ...............................................................11

California Code of Civil Procedure §340.8.................................................11, 19, 20

California Water Code §102 ......................................................................................14

California Evidence Code §412..................................................................................4

## OTHER AUTHORITIES

California Civil Jury Instructions 1201 ......................................................................1

California Civil Jury Instructions 1203 ......................................................................1

California Civil Jury Instructions 1204 ......................................................................2

California Civil Jury Instructions 1244 ....................................................................15

*///*

**TABLE OF AUTHORITIES**

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# RULES

Rule 37(c)(1)............................................................................................18

# TREATISES

Restatement (Second) of Torts §440 .....................................................16

# CONSTITUTIONAL PROVISIONS

United States Constitution Article VI.....................................................15

# I.      PLAINTIFF'S CLAIMS

## A.      Summary of Claim and Elements

Plaintiff has abandoned all claims except for the first cause of action for "strict products liability based on defective design."   As plead in Plaintiff's Amended Complaint, the defective design claim seeks recovery under both the "risk-benefit" and "consumer expectation" tests.[1]  The two tests have several elements in common:

1.      That SQMNA distributed or sold the fertilizer to users in Pomona;

2.      That such fertilizer contained a manufacturing defect at the time of sale or distribution;

3.      That Plaintiff's physical property was harmed; and

4.      That the defect was a substantial factor in causing that harm to physical property.

(CACI 1201; *Aas v. Superior Court* (2000) 24 Cal.4th 627.)

The "consumer expectation" test contains the following additional element:  that the fertilizer "did not perform as safely as an ordinary consumer would have expected it to performed *when used*."  (CACI 1203.)

The use comment to CACI 1203 makes clear that the consumer expectations test is applied to the safety expectation *at the time of the use of the product*:

> To make a prima facie case, the plaintiff has the initial burden of producing evidence that he or she was injured *while the product was being used* in an intended or reasonably foreseeable manner.

The Court must "make an initial determination as to whether the consumer expectation test applies to the product."  (CACI 1203 Use Comment.)  The Court should not give the consumer expectation test to the jury where the alleged product

---

[1]  In its Motion *in Limine* No. 1 to exclude evidence of the risk-benefit test (doc #99), the City attempts to make a "contingent election" to proceed at trial only on the consumer expectations test.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1                                   1
**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

1   failure is not "one about which ordinary consumers can form minimum safety

2   expectations." *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4[th] 1298,

3   1311-1312.  A long line of California Supreme Court cases instruct that the "consumer

4   expectation test is reserved for cases in which the *everyday experience* of the product's

5   users permits a conclusion that the product's design violated minimum safety

6   assumptions." *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567.

7       For purposes of this litigation, Plaintiff has acknowledged that the time period

8   during which SQMNA's product could have been in Pomona, if at all, is between 1931

9   and approximately 1950.  Nevertheless, Plaintiff has not identified a single user of

10   SQMNA's products and, to the extent it was ever used in Pomona or the surrounding

11   areas, there are no reported incidents where a farmer experienced any bodily injuries or

12   property damage due to perchlorate or suffered any  adverse "everyday experience"

13   with the product.

14       The "risk-benefit" test is the other way to establish a design defect claim.  If the

15   Plaintiff proves that the fertilizer's "design" was a substantial factor in causing harm

16   (bodily injury or property damage) to Pomona, then the burden shifts to Defendant to

17   prove "that the benefits of the fertilizer's design outweighed the risks of the design" at

18   the time of usage.  (CACI 1204.)  The factors to be considered under CACI 1204 are:

19       (a)   The gravity of the potential harm resulting from the use of the

20           product;

21       (b)   The likelihood that this harm would occur;

22       (c)   The feasibility of an alternative safer design at the time of

23           manufacture;

24       (d)   The cost of an alternative design;

25       (e)   The disadvantages of an alternative design; and

26       (f)   Other relevant factors.

27   ///

28   ///

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

In this case, another relevant factor that the jury must consider is the involvement of the United States government in importing and distributing Chilean sodium nitrate as a strategic mineral for wartime food production and other uses, including munitions.

### B.   Summary of Evidence Opposing Plaintiff's Case in Chief

#### 1.   Product Identification (Request for FRE 402 Hearing)

Pomona's entire case rests on expert evidence that SQMNA's fertilizer, in fact, was used in the Pomona area, and that it caused "the harm" prayed for in the amended complaint – the economic costs of cleaning groundwater to meet the 2007 public health requirement limiting  perchlorate to 6 parts per billion ("ppb").  Caustion  will  be  a hotly contested issues.  Pomona principally relies on Neil Sturchio whose untested stable isotope analysis was conducted in an unaccredited laboratory, that has never been admitted in a federal court, and which testing cannot be replicated.  Pomona's other witness, Frederick Sundstrom, relies completely on old advertisements, shipping records into the state, and journals to try to show that SQMNA's product was used in Pomona.

Both experts are subject to *Daubert* motions,[2] and SQMNA <u>requests that the Court conduct a FRE 402 hearing before allowing them to testify</u>.  Not only are the untested methodologies  employed to support their hypothesis flawed, but their conclusions are also highly suspect because (a) neither witness accounts for the potential use of sodium nitrate in Pomona from 1880 through 1931 when SQMNA started doing business in California; and (b) the use of sodium nitrate in flares, fireworks, munitions and other industrial uses wholly apart from fertilizer use from the 1880s through the present.

---

[2] Defendant objects to all of Plaintiff's experts because  they were designated too late to be deposed before the discovery cut-off and Plaintiff refused to make them available for deposition. (See motion to strike at Document Nos. 65, 66, 70, 90 and 92.)  Defendant has filed an *ex parte* application to specially set the hearing on the motion to strike for hearing with the rest of the motions in limine.  (Document No. 130.)



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1

3

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

1    The failure of Pomona to call a single percipient witness to testify that they used

2    SQMNA's fertilizer in Pomona before the 1950s is a fatal evidentiary gap.  Secondary

3    "expert" testimony in the absence of more credible evidence should be ignored.  See

4    *e.g.* Evidence Code section 412.  In this case, individuals who farmed in Pomona in the

5    1930s and 1940s should have been consulted.  In contrast, SQMNA will rely upon Ted

6    Batkin, Director of the California Citrus Research Institute, who will testify that sodium

7    nitrate was infrequently used (if at all) for citrus in Pomona because it was significantly

8    more expensive than other fertilizers and was deleterious to the local soils given their

9    high alkaline and salt content.  SQMNA's Board Minutes and the testimony of expert

10   Ford West, President of The Fertilizer Institute, prove that California was not a large

11   market for its sodium nitrate, after the 1920s, most of which was used on row crops on

12   the East Coast.

13   Pomona's own expert, Charles Sanchez, agrees with Batkin and acknowledges

14   that sodium nitrate was not widely used for citrus in the Pomona area.

15   The expert testimony of Dr. Richard Laton also supports SQMNAs contention

16   that sodium nitrate fertilizer was not used in any significant amounts.  In contrast to the

17   high levels of perchlorate in groundwater wells found in Pomona's industrial corridor,

18   Laton points to large areas of former agricultural lands that have few or no reports of

19   perchlorate contamination.  The elevated perchlorate readings in the Pomona well field

20   strongly suggests a "point source" or sources is the culprit, rather than the diffuse use of

21   fertilizer over a wide area over sixty years ago.

22   Plaintiffs' case amounts to the hypothesis that SQMNA's product must have

23   been used on historic citrus and that, if it was, that use had to occur *after 1927* and

24   before 1950 only.  Such "precise" historic recreation is supported by the expert

25   testimony of Dr. Wheatcraft.  Wheatcraft has no direct evidence about when fertilizer

26   was used or where it was used.  Nevertheless, he calculates, in reverse, how a molecule

27   of perchlorate in  SQMNA's fertilizer would have traveled from the farm to the

28   Pomona well field – without having even tested the existence of perchlorate in the farm.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Furthermore, Wheatcraft fails to provide any mass balance analysis that would have
2  explained the concentrations existing in the Pomona well field after considering the
3  amount of fertilizer used, the amount of fertilizer absorbed by the crops, the amount of
4  perchlorate bio-degradated in the soil, *etc.*

5       Expert Murray Einarson demonstrates that the opinion testimony of Stephen
6  Wheatcraft is entirely unreliable for the reasons stated above and also because it relies
7  upon a model developed to assess a large geographic area (the entire Chino Basin
8  Watershed) rather than the specific are at issue

9            **2.    No Defect**

10      Plaintiff argues that the fertilizer was defective in that it contained trace amounts
11  of perchlorate.  Defendant dispute that this constitutes a defect because:

12      (1)    Sodium nitrate was unquestionably the most important fertilizer used in
13      the world between 1850 and 1920.  Governmental regulations, field experiments,
14      technical literature and agricultural benefits observed all around the world
15      confirm the above.

16      (2)    Sodium nitrate is a natural product containing a variety of well
17      documented micronutrients that constituted one of the main attributes of this
18      fertilizer.  Trace amounts of naturally occurring perchlorate are merged with the
19      referred micronutrients.  Particularly, perchlorate is present as the compound
20      potassium perchlorate.  Potassium is a vital and useful nutrient for plants.

21      (3)    The U.S. Government was fully aware of the perchlorate content of
22      sodium nitrate and nevertheless considered it vital for food production in our
23      country.    The U.S. Government urged Chilean Government to increase
24      production – even by means of reopening the old Shanks[3] operations – and it

25  _____

26  [3] The "Shank" system preceded the "Guggenheim" system in the production of sodium
27  nitrate.  It was well known that sodium nitrate produced through the "Shank" system
   contained a higher level of impurities – including perchlorate.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

subsidized transportation of SQMNA's product into the country during World War II. Pomona has admitted that SQMNA acted as the agent for the U.S. Government in distributing sodium nitrate.

(4)    The perchlorate did not cause Pomona harm as that term is used in products liability law. Pomona's damages result entirely from a change in regulatory standards regarding the margin of safety for serving drinking water. The 2007 MCL does *not* mean that the drinking water above MCL caused or will cause injuries; it simply adopts a threshold that ensures a large margin of safety for even the most sensitive members of the public. Pomona has admitted that at the time its water was served in compliance with a higher regulatory standard, it was still safe. Taken to its extreme, Plaintiffs theory would mean that SQMNA's fertilizer was defective in states where a low MCL was adopted and not defective in the roughly 45 U.S. states that have no MCL at all. Because SQMNA's fertilizer was not defective before 2007, it could not have been defective at the time of sale.

(5)    Pomona admits that the potassium perchlorate in sodium nitrate is "naturally occurring." Naturally occurring substances generally do not constitute "defects" even when they cause injury. *Mexicali Rose v. Superior Court* (1992) 1 Cal.4th 617 (chicken bone in chicken enchilada is not a "defect" because it is naturally occurring); *Ford v. Miller Meat Company* (1994) 28 Cal.App.4th 1196 (bone chip in hamburger is not a defect); *Harris v. Costco Wholesale Corp.*, 2011 U.S. Dist. LEXIS 5406 (N.D.CA. 2011) (large meat sample served at Costco is not a defect). The asbestos cases are *sui generis* and are inapt here because the extreme toxicity of asbestos caused serious bodily injury; no bodily injuries are alleged in this case. Cf., *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178; and *Morson v. Superior Court*, 90 Cal.App.4th 775, 786 (2001) (holding that case authorities in the asbestos context are "of limited

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1

6

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

value" in other cases because of "the problem of comparing apples and oranges in such fact-specific circumstances").

### 3. Consumer Expectation Test

As noted above, the Court must make the preliminary determination as to whether the consumer expectation test should be given to the jury. Since the alleged harm is so elusive – not a single bodily injury has *ever* been reported in Pomona from perchlorate ingestion and no farmer has ever suffered harm to farmland – it cannot be said that the harm at issue in this case is part of the "everyday experience" of the typical farmer or buyer of fertilizer. Here, we have no "typical" farmer that was harmed during his "everyday experience" with the product. Rather, the regulatory compliance costs that Pomona now apparently faces is something that a 1930s era farmer would never have imagined or foresaw. Thus, as a matter of law – if not common sense – a farmer would not have had any expectation regarding the impact of fertilizer on drinking water supplies in the next millennium.

Ted Batkin will testify that farmers were aware of the toxicity of fertilizer from direct ingestion but that nothing was known about the potential negative effects of fertilizers on drinking water until the 1980s. Expert toxicologist Scott Phillips will testify that indirect exposure to fertilizer from normal handling in growing applications would present no elevated clinical risk to growers. Accordingly, the toxicity of sodium nitrate at the time of sale and use by growers did not fail to meet the expectations of the reasonable grower. Mr. Patricio de Solminihac, President of SQMNA, and Mr. Eugenio Ponce, member of the Board of SQMNA, will testify to the lack of any reports of adverse health effects from perchlorate from the use of SQMNA's products. Pomona has admitted that perchlorate in its groundwater has not caused any bodily injuries at any time.

Pomona further admits that any sodium nitrate use in Pomona ended in the 1950s, and that at the time fertilizer use had ended that no drinking water had been



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   damaged.  Thus, there was no failure to meet any expectations regarding environmental

2   contamination during the use of the product.

3                   **4.      Risk-Benefit Test**

4         Plaintiff has no experts to testify about the feasibility of any alternative to re-

5   design the fertilizer and hence their case fails completely under the risk-benefit test.

6   Defendant will present several witnesses testifying that the fertilizer could not be re-

7   formulated to remove perchlorate.

8         At least two different Chilean nitrate production systems were operating during

9   1930s and 1940s, Guggenheim and Shanks processes. None of the science related to

10  perchlorate separation and extraction from the salts matrix in the ore and perchlorate

11  measurement were available during these years. The only efforts related to perchlorate

12  separation were made in the late 1890s to separate over 1% perchlorate concentrations

13  in high perchlorate ore using rudimentary methods. Even today, with all incorporated

14  technology and controlling capability the Guggenheim process is not capable to

15  separate more than a minimum quantity of perchlorate. Both Guggenheim and Shanks

16  processes would have needed specially designed refination plants to re-crystalize the

17  already produced sodium nitrate.  All of these only in theory, since these plants would

18  have needed to be deployed either beside each of the multiple facilities located in the

19  375 miles long Atacama Desert in the Provinces of Tarapacá, Atacama and

20  Antofagasta, or alternatively on each of the multiple Chilean ports of origin or in the

21  multiple United States receiving ports.  As it will be demonstrated by SQMNA

22  witnesses, the nitrate market share sales of sodium nitrate in California were minimum

23  during the 1930s, and only increased during the war years, to disappear from California

24  right after. Consequently, the investments would have been needed for the war only and

25  consequently constructed and depreciated for that period.

26        All of these efforts and costs are claimed as something necessary to be

27  accomplished in a time when no concept of "groundwater contamination" by any

28  agricultural input was yet known. Particularly, the same is claimed,  when there was no

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1                                        8
DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)

shred of scientific knowledge of any potential environmental risk associated to perchlorate. On the other hand, the disadvantages of the new "design" would have been immediately clear and would have been a disaster for the Chilean nitrate producers and the users of such product, including the U.S. Government during War World II. The worldly recognized Chilean nitrate could have no longer market its natural micronutrients advantages over synthetic commodities, so called "vital impurities" its main selling argument to compete with cheaper nitrogen sources accelerating its declining use. The Chilean nitrate micronutrients would have been inevitably eliminated with the extraction of perchlorate. The extraction of perchlorate, if feasible, would have inevitably increased losses of nitrogen in the production process diminishing its production capacity even further making U.S. Government needs during the war even harder to meet. Moreover, the extraction of perchlorate would have affected the firmness and shelf life of the product, what would have produced logistic losses during transport and use and higher dust emission, all of these increasing difficulty of use and cost.

Defendants will call expert Ford West to testify about the importance of sodium nitrate at the turn of the Twentieth Century when no adequate substitutes were available. He will document, however, how the importance of sodium nitrate declined rapidly at the beginning of the 20th Century due to  the development of cheaper synthetic fertilizers and ammonia sulfate.  Nevertheless, when World War II broke out, Mr. West will testify that the U.S. Government – with full knowledge of the chemical composition of sodium nitrate (including its perchlorate content) – requisitioned its supply and controlled its distribution during the war years, and later encouraged its use during peace time.

Even under some incredible theory that the technologies and controls available to remove perchlorate actually existed during the relevant time frame, its elimination would have reduced the critical supply of nitrate needed to grow badly needed crops. SQMNA's products today are targeted to an entirely different specialty market that

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  applies liquid fertilizers directly to folia (leaves) for more direct update of nitrate. This

2  means, less nitrate can be used.

3       Experts Batkin and West will speak about the micronutrients the sodium nitrate

4  provides, and how the product would have been less useful to food production crops if

5  the micronutrients were reduced or eliminated in an effort to remove perchlorate, and

6  how reducing the nitrate production by removing perchlorate would have been injurious

7  to the national supply of fixed nitrogen.

8          **5.**  **"Harm" – Economic Loss Not Recoverable**

9       Under products liability law, the only compensable harm are damages for bodily

10 injury or damage to tangible property. *Aas v. Superior Court, supra;*  Plaintiff argues

11 that it has intangible rights to the use of water, but such intangible rights cannot support

12 the requisite damage to tangible property for recovery under products liability law, as

13 discussed in the Motion for Summary Judgment. *See, also, California Department of*

14 *Toxic Substances Control v. Payless Cleaners* (E.D. Cal.) 2007 WL 2580626;  *County*

15 *of Santa Clara v. Atlantic Richfield Co*., 137 Cal.App.4th 292 (2006).

16      If any part of the damage claim survives the motion for summary judgment, it

17 will be essential that the jury is properly instructed as to the "harm" that is subject to

18 compensation under products liability law. Products liability law protects the interests

19 of consumers in *safety*. Yet none of the users of the fertilizer suffered any injury to

20 body or property. No damage is alleged to have occurred to either body or property

21 during the useful life of the fertilizer. The sole harm for which the Plaintiff seeks

22 recovery is the regulatory cost of water clean up to water standards not even envisioned

23 in the 1930s, and thus not expected. Nor was the implementation of water quality

24 standards for perchlorate reasonably foreseeable in the 1930s. There will be no

25 admissible evidence produced in support of either proposition.

26 ///

27 ///

28 ///

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

10

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

## II.    AFFIRMATIVE DEFENSES

### A.    Statute of Limitations

#### 1.    Summary Statement

Pursuant to affirmative defenses numbers 10, 12 and 17, Plaintiff's products liability claim is barred by the three year statute of limitations in California Code of Civil Procedure section 338(b) and by the two year statute of limitations in C.C.P. section 340.8.  C.C.P. section 340.8 "applies to 'any' civil action 'for injury or illness based upon exposure to a hazardous material or toxic substance.'" *Nelson v. Indevus Pharmaceuticals, Inc.* (2006) 142 Cal.App.4th 1202 at 1209.

#### 2.    Elements and Key Evidence

The statute of limitations "begins to run upon the occurrence of the last event essential to the cause of action."  *Wilshire Westwood Assoc. v. Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 739.  The infliction of "appreciable and actual harm, however uncertain in amount, will commence the statutory period.  Under present authority, neither uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations." *Davies v. Krasna* (1975) 14 Cal. 3d 502, 514.

The key evidence (described in more detail in the motion for summary judgment) supporting this defense is that the last use of sodium nitrate in Pomona was no later than the 1950s.  Pomona began sampling (and discovered) perchlorate in its drinking water supply in 1997. Since 1997, Pomona has incurred investigating sampling expenses for perchlorate.  Pomona seeks those sampling expenses in its complaint and initial disclosure statement.  By 2002, more than half of its wells were impacted by perchlorate and at least two were closed because of perchlorate.  In 2003, Pomona installed a perchlorate treatment system at Well 19, which was later moved to Well 29.  In 2005, it began expending design money for the installation of a multi-million dollar well treatment system for perchlorate at Well 37, which in its complaint and initial disclosures it admits was for the treatment of perchlorate, and constitutes damage which it seeks to recover in this case.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1
11
**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

1    In 2005 and 2006, Pomona was actively participating in investigations contacted
2   by the Chino Basin Watermaster, of which Pomona is a 20% member, to determine if
3   Chilean nitrate was the origin of the perchlorate.  By at least December 2006, it
4   received reports that stable isotope tests of water taken from Pomona wells contained
5   perchlorate from Chilean nitrate origin.  On multiple other occasions it was informed of
6   the alleged Chilean origin of perchlorate in its groundwater before October 2007.
7   Pomona did not file suit until October 15, 2010.

8    Plaintiff's damage expert Ken Wilkins will testify that Pomona's financial losses
9   due to perchlorate in drinking water wells did not commence until October 2007.
10   Defense expert Rhodes Trussell will rebut that analysis and show that the starting dates
11   for those financial losses occurred well before –October 2007 by almost a decade.
12   Wilkins' testimony about the damage incurred in constructing a perchlorate treatment
13   plant is more than compensated for by the economic value of the potable water
14   obtained from the Chino Basin aquifer.

15   **B.    Standing**

16        **1.    Summary Statement**

17    Pursuant to affirmative defenses numbers 8, 14 and 24, Plaintiff's products
18   liability claim is barred because Pomona was neither a consumer nor user of the
19   product, and its alleged injury occurred after the product was no longer in use.

20        **2.    Elements and Key Evidence**

21    Pomona admits in its amended complaint and in its interrogatory answers that it
22   was neither a consumer nor user of sodium nitrate, and has admitted in its interrogatory
23   answers that its alleged injury first occurred in October 2007.  Pomona also admits in
24   its interrogatory answers that the sodium nitrate product was not used in Pomona after
25   the 1950s.  Those admissions are true and are supported by other evidence.

26    A manufacturer cannot be liable for injuries long after the product is "off the
27   market," where the alleged injury cannot possibly be foreseen, and where the alleged
28   injury is to an entity who was not a "bystander" to the original use.  See *Nelson v.*

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1

12

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

1  *Superior Court*, 144 Cal.App.4th 689, 695-698 (2006); *Elmore v. American Motors*

2  *Corp.*, 70 Cal.2d 578, 586 (1969) (holding that liability is proper only "where injury to

3  bystanders from the defect is reasonably foreseeable").  See also, *Torres v. Taser Int'l,*

4  *Inc.*, 277 Fed. Appx. 684, 2008 U.S. App. LEXIS 10169 (9th Cir. Cal. 2008).  The law

5  regarding the lack of standing of a non-user of a product to sue for products liability,

6  long after the product is no longer in use, is set forth in more detail in SQMMA's

7  Motions in Limine and in its opposition to Plaintiff's Motions in Limine.

8        **C.      The Economic Loss Rule Bars Plaintiff's Claims**

9               **1.      Summary Statement**

10       Plaintiff's claim is barred by the economic loss rule, which holds that the

11  economic cost of groundwater remediation is "economic loss" not recoverable under

12  products liability theories.  See affirmative defenses numbers 18 and 20.

13       The controlling decisions are *Aas v. Superior Court* (2000) 24 Cal.4th 627;

14  *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 318;

15  *California Department of Toxic Substances Control v. Payless Cleaners* (E.D. Cal.)

16  2007 WL 2580626.  The issue is discussed in full in SQMNA's motion for summary

17  judgment and reply documents.

18               **2.      Elements and Key Evidence**

19       Under California law, "One thing is clear: …'In a strict liability or negligence

20  case, the *compensable injury* must be *physical harm to persons or property*, not mere

21  economic loss.'" *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137

22  Cal.App.4th 292, 318 (emphasis in original, quoting *Zamora v. Shell Oil Co.* (1997) 55

23  Cal.App.4th 204, 210.)  The law of product liability was never intended to compensate

24  for injuries to intangible rights that result in increased business expenses or lost profits.

25  *Santa Clara*, 137 Cal.App.4th at 318, 320-321 (costs incurred for the "abatement,

26  removal, replacement and/or remediation" of potentially harmful lead paint could not

27  support negligence or strict liability causes without actual physical injury to the

28  plaintiff's real property itself).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  The economic loss defense has been invoked in a number of cases by the

2  California Supreme Court.   See *e.g.*, *Aas v. Superior Court* (2000) 24 Cal.4th 627;

3  *Seely v. White Motor Co.* (1965) 63 Cal.2d 9.  The economic loss rule has also been

4  applied by federal courts in this Circuit, in cases decided under California law.  *See,*

5  *e.g., Nabors v. Google, Inc.* 2011 U.S. Dist LEXIS 97924 at *21-*22 (N.D. Cal.);

6  *Casden Builders v. Entre Prises USA, Inc.* 2010 U.S.Dist LEXIS 82423 at *6 to *16

7  (C.D. Cal.); *Molly Stearns v. Select Comfort Retail Corporation*, 763 F. Supp.2d 1128,

8  1141-43 (N.D.Cal. 2010).

9  In California, "[a]ll water within the State is the property of the people of the

10  State, but the right to the use of water may be acquired by appropriation in the manner

11  provided by law."  Cal. Water Code, §102.   The only interest Pomona acquires by

12  appropriating water is "the right to the use of water" – it cannot own the water itself,

13  which is "property of the people of the State."  *Id.*; see also *Aerojet-General Corp. v.*

14  *Super. Ct.* (1989) 211 Cal.App.3d 216, 229; *State v. Super. Ct. of Riverside County*

15  (2000) 78 Cal.App.4th 1019, 1030.

16  Pomona does not, and cannot, claim that perchlorate has caused physical damage

17  to any of the physical property Pomona owns, such as its production wells, and

18  associated equipment.  Pomona alleges only that it "has incurred, is incurring, and will

19  continue to incur, investigation, treatment, remediation and monitoring costs and

20  expenses . . . ."  (Amended Compl., ¶ 33.)  As in the *Santa Clara* and *Payless* cases,

21  these purported injuries are purely economic losses that are not compensable under

22  strict liability and negligence theories.

23  Any purported injuries Pomona has suffered to its intangible right to "use" the

24  water do not constitute physical injury to its property, but are simply economic losses.

25  Pomona's contention that the damage occurred when the MCL went into effect shows

26  that the claims are for the cost of regulatory compliance, because the same perchlorate-

27  tainted water was in the wells before the new regulation went into effect on October 17,

28  2007.  The adoption of the new MCL did not damage the water – the new MCL simply

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1                                      14
DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)

1  made it more expensive for Pomona to use the water.  For that reason, this is a classic

2  claim involving mere economic loss, not property damage.  See, *e.g.*, *Santa Clara*, 137

3  Cal.App.4th at 318 (economic loss rule requires "physical injury to plaintiffs'

4  property").

**D.    United States Approval, Pre-emption and Sophisticated User**

**1.    Summary Statement**

7  Pursuant to affirmative defenses numbers 2, 16, 19 and 34, any and all sales of

8  sodium nitrate to the United States, which in turn allegedly re-sold sodium nitrate to

9  growers in Pomona, cannot subject SQMNA to liability for products liability.

**2.    Elements and Key Evidence**

11  The elements of this defense are the following:

12  (a) the U.S. Government was a sophisticated purchaser of the fertilizer with full

13  knowledge of its chemical composition including trace amounts of perchlorate;

14  (b) SQMNA had no choice or control over the sales decisions; and

15  (c) the U.S. Government was in possession of superior knowledge of the

16  fertilizer's benefits and risks; and

17  (d) in time of war, public policy requires that the U.S. Government be able to

18  requisition and distribute strategic materials without threat of products liability.

19  Growers relied upon the Government for agricultural advice and direction.

20  The intervention of a learned intermediary or sophisticated user operates as a

21  defense to a products liability case.  CACI 1244; *Johnson v. American Standard, Inc.*

22  (2008) 43 Cal.4th 56, 71.  The pre-emption of any contrary rule of civil liability follows

23  from the Supremacy Clause in Article VI of the U.S. Constitution.  *Pennsylvania v.*

24  *Nelson,* 350 U.S. 497 (1956) (when federal occupation of the field occurs, there is "no

25  room" left for state regulation); *American Insurance Association v. Garamendi,* 537

26  U.S. 1100 (2003) (California law requiring insurers to disclose Holocaust survivor

27  information held preempted by the power of the Executive Branch to conduct foreign

28  policy.)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1

15

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

Pomona claims that during World War II there was increased use of sodium nitrate in Pomona in citrus groves despite no evidence to support it. During World War II, the Government requisitioned the entire supply of sodium nitrate as a strategic material in view of its value as both a fertilizer and a source of munitions. SQMNA had no choice but to sell sodium nitrate to the U.S. Government, and was required by the Government to distributed it as it directed. Moreover, to meet U.S. needs, Chilean nitrate producers (over whom SQMNA had no direct control) reactivated older production facilities working with the Shanks process, which the U.S. Government knew and informed the fertilizer users, manufacture a less refined grade of sodium nitrate. If any sodium nitrate was distributed in Pomona during World War II, it was done at the direction of the Government. In time of war, the Government is entitled to exercise such extraordinary powers, and its exercise of these powers preempt any civil liability which might otherwise attach in obeying governmental orders. This is an even stronger case for the application of preemption that *American Insurance Association v. Garamendi, supra.*

### E.    Superseding Cause/ Lack of Foreseeability

#### 1.    Summary Statement

Pursuant to affirmative defenses numbers 4, 7 and 13, SQMNA has no liability to Plaintiff because the conduct of the United States in requisitioning sodium nitrate and making alleged re-sales in Pomona was an unforeseeable superseding cause over which Defendant had no control. Furthermore, the conduct of the State of California in creating a MCL for perchlorate in drinking water of 6 ppb was an unforeseeable superseding cause of Pomona's alleged injuries.

#### 2.    Elements and Key Evidence

An act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about. Restatement (Second) of Torts, §440.

///

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

The alleged conduct of the United States in distributing in Pomona the sodium nitrate it had requisitioned from SQMNA is the type of unforeseeable intervening force which exculpates SQMNA from liability.   In addition, the conduct of the State of California in adopting stringent perchlorate standards more than 50 years after the last alleged sale of sodium nitrate in Pomona is also such an unforeseeable intervening event.

The evidence will establish each of the above elements.  The "harm" of having to built a perchlorate treatment facility arose solely from the state's adoption of the MCL. For at least ten years before that MCL Pomona knew there was perchlorate in the drinking water but declined to treat it because it was unnecessary to do so.  Only the adoption of the MCL, according to Pomona, caused it to build the treatment facility. Similarly, only the conduct of the United States caused the alleged distribution of sodium nitrate in Pomona during the war years.  The alleged environmental "harm" was completely unforeseeable by SQMNA.  The intervening forces were due to the actions of the United States, on the one hand, and the State of California, on the other.

### F.    Comparative Negligence

#### 1.    Summary Statement

Pursuant to affirmative defenses numbers 3, 6, 15, 22, 28, 29 and 30, Plaintiffs claims are either barred or subject to reduce by its comparative fault

#### 2.    Elements and Key Evidence

The elements of comparative negligence is that Pomona was negligent and the negligence was a substantial factor in causing its harm.  Pomona was negligent in importing perchlorate laden water from the Metropolitan Water District which was piped into its distribution system and used largely for residential and commercial irrigation.  After being deposited on the land, the perchlorate laden water migrated to the groundwater. Pomona was further negligent by locating its municipal water wells in the most industrialized and contaminated area of its City.

///

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1

17

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

1   In addition, Pomona was negligent in concentrating the perchlorate at its AEP

2   and releasing it into leaky brine lines which ultimately reintroduced the perchlorate into

3   the groundwater.. Pomona knew that the brine lines contained very high concentrations

4   of perchlorate but failed to adequately ensure that its sewer lines which transported the

5   brine were leak free.  The leaks best explain the spot elevations in perchlorate as

6   compared to areas of traditional agricultural operations, as set forth in the monitoring

7   well data as summarized by Dr. Laton's report.

8   **III.   ANTICIPATED EVIDENTIARY ISSUES**

9   There are a number of significant evidentiary issues raised in the motions in

10   limine that have been filed by both parties.  In addition, the following issues are key.

11   **1.      Striking of Experts.**

12   Pomona designated its experts on October 14, 2011, just a few days before the

13   October 23, 2011 discovery cutoff.  It intentionally followed a litigation strategy to

14   deny Defendant its right to depose Plaintiff's experts.  Plaintiff has refused to make its

15   experts reasonably available for deposition.  For the reasons set forth in SQMNA's

16   Motion to Strike Plaintiff's Experts (and for other relief) (Document numbers 65, 66

17   and 70), the experts must be stricken under Rule 37(c)(1).  Defendant requests that the

18   Court grant this relief, and hear the motion to strike.

19   **2.      FRE 403 Hearing on *Daubert* Objections.**

20   Pomona has no witness who will say that he used sodium nitrate in Pomona at

21   any time, or that he knows anyone who did.  Pomona seeks to fill that evidentiary void

22   solely with expert testimony that is insufficiently tested and not generally accepted for

23   this application.  In particular, Pomona seeks to have the stable isotope opinions offered

24   by Neil Sturchio to show that the perchlorate in Pomona's groundwater comes from the

25   Atacama Desert in Chile (although he cannot logically say *when and for what*

26   *application* it was used, "when" is important since most sodium nitrate imported into

27   the United States was before SQMNA existed and "what application" is also important

28   since he only considered alleged fertilizer use ignoring any industrial application uses).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1
18
**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

1   A FRE 403 hearing is vitally necessary to test the applicability of the *Daubert*
2   factors out of the presence of the jury.  It is especially necessary since Defendant was
3   denied its right to depose Sturchio on his opinions.  A FRE 403 hearing is also
4   necessary to ascertain whether Sundstrom's opinions regarding the use of sodium
5   nitrate in Pomona are based on solid methodology or are simply "made to order"
6   conclusions paid for by Pomona's counsel.

7   **IV.    IDENTIFICATION OF ISSUES OF LAW**

8   **1.    Motions in Limine**

9   Defendant's motions in limine raise several legal issues which should be
10   determined before the start of trial.  The grant of those motions will moot the trial, or
11   alternatively, drastically narrow the scope of the issues to be tried.

12   **2.    Statute of Limitations**

13   If Defendant's motion for summary judgment has not been granted by the time
14   the Court considers this memorandum, an important issue for the Court to determine is
15   whether the shorter two years statute of limitations set forth in C.C.P. section 340.8
16   applies.  That statute states:

> (a) In any civil action for injury or illness based upon
> exposure to a hazardous material or toxic substance, the
> time for commencement of the action shall be no later than
> either two years from the date of injury, or two years after
> the plaintiff becomes aware of, or reasonably should
> have become aware of, (1) an injury, (2) the physical cause of
> the injury, and (3) sufficient facts to put a reasonable
> person on inquiry notice that the injury was caused or
> contributed to by the wrongful act of another, whichever
> occurs later.

25   Pomona's claim is a "civil action for injury or illness based upon exposure to a
26   hazardous material or toxic substance."  The word "injury" is broader than illness
27   which refers solely to bodily injury.  The use of the word "any" before injury supports

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-5611-7518.1
19
**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**

1   the plain meaning of the statute that injury refers to *any* injury including injury to

2   property based upon exposure to a toxic substance.   Pomona's experts opine

3   extensively of the "toxicity" of perchlorate, so this element is clearly admitted by

4   Pomona.

5       If C.C.P. 340.8 applies, then there is no doubt that the claim is barred because

6   Pomona admits its "property" was injured in October 2007, which is more than two

7   years before the filing of this case on October 15, 2010.

8               **3.     Economic Loss Rule**

9       This is discussed above and addressed in SQMNA's motion for summary

10  judgment.   It is SQMNA's position that this rule bars the City's claims as a legal

11  matter.

12  Dated:  December 13, 2011        LEWIS BRISBOIS BISGAARD & SMITH LLP

13

14                          By:_____/s/ R. Gaylord Smith_____
                                R. Gaylord Smith
15                              Malissa Hathaway McKeith
16                              Michael K. Johnson
                                Joseph A. Salazar
17                              Defendant     SQM     NORTH     AMERICA
18                              CORPORATION

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW



4838-5611-7518.1

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4.1)**