R. GAYLORD SMITH, SBN 72726
MICHAEL K. JOHNSON, SBN 130193
LEWIS BRISBOIS BISGAARD & SMITH LLP
650 Town Center Drive, Suite 1400
Costa Mesa, CA 92626
Tel: (714) 545-9200
Fax: (714) 850-1030
Email: bob.smith@lewisbrisbois.com

Attorneys for Defendant SQM NORTH AMERICA CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CITY OF POMONA,<br><br>    Plaintiff,<br><br>vs.<br><br>SQM NORTH AMERICA CORPORATION,<br><br>    Defendant. | CASE NO. 2:11-cv-00167-RGK (JEMx)<br><br>**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER MAKING FINDINGS TO SUPPORT THE ADMISSIBILITY OF DR. LATON'S TESTIMONY**<br><br>[*Notice of Motion of SQMNA's Motion; Declaration of R. Gaylord Smith; and [Proposed] Order filed herewith.*]<br><br>Trial Date: May 8, 2019 |

4823-7515-5803.1

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER MAKING FINDINGS TO SUPPORT THE ADMISSIBILITY OF DR. LATON'S TESTIMONY

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 5

II. POMONA'S *DAUBERT* MOTION ................................................................... 7

III. THE FINDINGS THAT THIS COURT SHOULD MAKE ............................. 12

    A. The Test under Rule 702 and *Daubert* ................................................ 12

    B. Findings as to Laton's Qualifications ................................................... 14

    C. Findings as Whether Laton's Opinions Are Helpful to the Jury .......... 14

    D. Findings as to the Threshold Reliability of Laton's Opinions .............. 15

    E. Laton Reliably Applied the Relevant Principles and Methods to the Facts at Hand .................................................................................. 17

IV. CONCLUSION ................................................................................................. 19

4823-7515-5803.1

2

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER MAKING FINDINGS TO SUPPORT THE ADMISSIBILITY OF DR. LATON'S TESTIMONY

# TABLE OF AUTHORITIES

**Cases**                                                            **Page**

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
   738 F.3d 960 (9th Cir. 2013) ............................................................................. 13

*City of Pomona v. SQM N, Am, Corp.*,
   866 F.3d 1060 (9th Cir. 2017) ....................................................................... passim

*City of Pomona v. SQM N, Am, Corp.*,
   750 F.3d 1036 (9th Cir. 2014) ..................................................................... 17, 15

*Claar v. Burlington N.R.R.*,
   29 F.3d 499 (9th Cir. 1994) ................................................................................ 14

*Clausen v. M/V New Carissa*,
   339 F.3d 1049 (9th Cir. 2003) ............................................................................ 14

*Dep't of Toxic Substances Control v. Technichem, Inc.*,
   No. 12-cv-05845-VC, 2016 U.S. Dist. LEXIS 33379 (N.D. Cal. Mar.
   15, 2016) .............................................................................................................. 18

*Liss v. Milford Ptnrs., Inc.*,
   No. HHDX07CV044025123S, 2011 Conn. Super. LEXIS 906 (Apr.
   11, 2011) .............................................................................................................. 17

*N. States Power Co. v. City of Ashland*,
   No. 12-cv-602-bbc, 2015 U.S. Dist. LEXIS 49387 (W.D. Wis. Apr.
   15, 2015) .............................................................................................................. 16

*Newark Group, Inc. v. Dopaco, Inc.*,
   No. 2:08-cv-02623-GEB-DAD, 2010 U.S. Dist. LEXIS 40150 (E.D.
   Cal. Apr. 1, 2010) ............................................................................................... 17

*Plainview Water Dist. v. Exxon Mobil Corp.*,
   856 N.Y.S.2d 502 at *20 (Sup. Ct. Nassau Co. 2008), *affirmed*, 888
   N.Y.S.2d 521 (2009) ...................................................................................... 16-17

*Pyramid Technologies, Inc. v. Hartford Casualty Insurance*,
   752 F.3d 807 (9th Cir. 2014) ......................................................................... 13, 15

*Primiano v. Cook*,
   598 F.3d 565 (9th Cir. 2010) .............................................................................. 17

*Stanley v. Novartis Pharms. Corp.*,
   11 F.Supp.3d 987 (C.D. Cal. 2014) .............................................................. 15, 17

4823-7515-5803.1

3

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER MAKING FINDINGS TO SUPPORT THE ADMISSIBILITY OF DR. LATON'S TESTIMONY

*Tyco Thermal Controls LLC v. Redwood Industrials*,
    No. C-06-07164-JF, 2010 U.S. Dist. LEXIS 47019 (N.D. Cal. Apr. 15 2010) .......................................................................................................... 18

*United States v. Rahm*,
    993 F.2d 1405 (9th Cir. 1993) ...................................................................... 17

*Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*,
    622 F. Supp. 2d 918 (N.D. Cal. 2009) ......................................................... 18

**Rules and Regulations**

40 CFR Part 312 ................................................................................................... 16

Federal Rule of Evidence

    702 ........................................................................................................... 12, 13

4823-7515-5803.1

4

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER MAKING FINDINGS TO SUPPORT THE ADMISSIBILITY OF DR. LATON'S TESTIMONY

LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060 (9th Cir. 2017) ("*Pomona II*") the Ninth Circuit reversed the judgment based on the jury verdict in favor of Defendant SQM North America Corporation ("SQMNA"). The Ninth Circuit directed the District Court to:

(1) allow Pomona's isotope expert Dr. Neil Sturchio ("Sturchio") to serve an updated report with "new data" (which has now been done);

(2) make findings in support of its order denying Pomona's *Daubert* motion as to defense expert Dr. Richard Laton ("Laton"). (Doc. # 304.)

In this motion SQMNA seeks an order setting forth the "findings" that the Ninth Circuit now requires for *Daubert* motions. Importantly, the Ninth Circuit did *not* direct this Court to grant Pomona's motion. Instead the "error" was limited to a procedural requirement that a *Daubert* ruling be accompanied by an "analysis or explanation" for its decision on the admissibility of expert testimony. *Id.* at 1069. Complying with this direction requires only that this Court supply "sufficient findings" before admitting Laton's expert testimony. *Id.* at 1060.

Laton's expert report (Exhibit 1 to the Smith Decl., Doc. #392-2)[1] rebuts the non-isotope opinions of Pomona's experts Neil Sturchio ("Sturchio") and Steven Wheatcraft ("Wheatcraft") by showing their reliance on a single line of evidence falls below the standard of practice for conducting hydrogeologic investigations. Laton relies on the more holistic methodology for site investigations authored by the California Department of Toxic Substances Control ("DTSC") entitled "Guidelines

---

[1] All exhibits hereinafter referenced are attached to the Declaration of R. Gaylord Smith filed in support of this motion. (Doc. #392-1.)

4823-7515-5803.1

5

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER MAKING FINDINGS TO SUPPORT THE ADMISSIBILITY OF DR. LATON'S TESTIMONY

for Hydrogeologic Characterization of Hazardous Substance Release Sites" (1995) ("DTSC Guidelines"). As one step of a multi-step process, those guidelines require the investigation of "potential" sources and the "release mechanisms" that could deliver the hazardous chemicals to the site. (Ex. 1; Doc. #392-2, p. 10.) One cannot rule out (as Pomona's expert have done) what one has not investigated.

Employing the methods set forth in the DTSC Guidelines, Laton opines that the hydrogeologic conditions at the Pomona Anion Exchange Plant ("AEP") wellfield demonstrate that the perchlorate is not coming from the former citrus orchards. Those orchards, located in the northern part of the "tear drop" shaped zone of influence of the AEP wellfield that is displayed within the green line in Figure 17 (Ex. 1, Fig. 17; Doc. #392-2, p. 65), and discussed in section 3.5.1 (Ex 1; Doc. #392-2, p. 29). Figure 17 shows that all up-gradient samples in the "teardrop" outlined in green are "non-detect" for perchlorate, with one exception which is still less than the legal maximum contaminant level ("MCL") of 6ppb. Yet the perchlorate hotspot at the AEP wells continues unabated after over 20 years of treatment. (Ex. 1; Doc. #392-2, pp. 41, 65.) This is not speculation; it is a conclusion based upon calculated values from known data. Laton's inference from those facts that there is likely a point source at the wellfield that is unrelated to fertilizer use in the orchards is well-reasoned. This opinion was properly admitted at trial, and should be admitted again. Pomona did not even move to exclude this opinion in its *Daubert* motion, limiting its attack to the opinions in section 3.1.2.

Sturchio used a single line of evidence – isotopic "fingerprinting" – to opine that the predominant source of perchlorate in Pomona's downtown wellfield came from the past use of sodium nitrate fertilizer imported from Chile. Putting to one side the credibility of Sturchio's isotope analysis (a task undertaken by other defense experts), Sturchio concedes that his isotope analysis is unable to age-date the perchlorate (Ex. 2; Doc. #392-3, p. 166:6-12) or to determine whether the perchlorate came from fertilizer uses of Chilean nitrate rather than industrial uses.

(*Id.*, p. 166:2-5.)  Laton identified these major limitations in section 5.1 of his report at page 38-39, and opines Sturchio's opinions about the use of fertilizer sold by SQMNA are unsound because they conflict with the hydrogeological evidence showing that there was no post-1931 use of sodium nitrate as fertilizer on the fields near the Pomona wellfield.  (Ex. 1; Doc. #392-2, pp. 44-45.)  Laton's methodology on this point cannot be questioned as Sturchio admitted both facts.  Pomona did not even address section 5.1 of the report in its *Daubert* motion.

## II. POMONA'S *DAUBERT* MOTION

Pomona's Motion in Limine No. 3 (Doc. #101) – its sole *Daubert* motion against Laton – was filed back on November 23, 2011 and was never renewed.  At that time Pomona scantily briefed the *Daubert* issue (the entire discussion is confined to pages 11 to 13 of its brief) because Pomona primarily relied on other grounds to exclude Laton.  (Doc. # 101).  None of those other grounds were raised on appeal or discussed in *Pomona II*.  They are waived.

Pomona's *Daubert* argument is premised on the assertion that Laton's "alternative source opinions"[2] in section 3.1.2 of his report are not the product of "any scientific methodology."  In so doing, Pomona simply ignores Laton's step by step reliance on the DTSC Guidelines at page 4 of his report.  Pomona's motion does not challenge the applicability the DTSC Guidelines.  It also does not challenge the reasoning in Laton's report that Pomona's experts neglected to take the following "minimum steps" in their investigation:

- "Description of the historic and current Site conditions including property use."

- "Evaluation of potential chemicals of concern (COCs) that may be present

---

[2] The term "alternative source" does not appear in Laton's report.  Rather, he faults the *investigation* by Pomona's experts as being non-compliant with the standard of care, as expressed in the DTSC Guidelines.

4823-7515-5803.1
7

at the Site based upon historic property usage and occupancy."

- "Evaluation of potential source areas and release mechanisms based upon past property."
- "Evaluation of the locations and types of chemical and/or petroleum releases at the Site and at offsite locations within approximately one miles radius of the Site."
- "Evaluation of past and present commercial and industrial activities that have a potential to release chemicals of concern within the project area and that may be a contributor to, or responsible for, the chemicals of concern present beneath the Site."
- "Evaluation of potential exposure, transport, and migration pathways."
- "Evaluation of data gaps and recommendations for additional assessments to effectively delineate the plume and/or determine the source of contaminants identified beneath the Site."

(Ex.1; Doc. #392-2, p. 10.)

Pomona's *Daubert* motion was limited to Laton's opinions in section 3.1.2 in his report entitled "Lack of Scientific and Professional Techniques."  Laton criticized Wheatcraft's lack of rigor in failing to comply with the DTSC Guidelines by not conducting failing to conduct an "[e]valuation of all potential sources" and to consider "potential exposure, transport, and migration pathways" – i.e., multiple lines of evidence.  (Ex.1; Doc. #392-2, p. 10.)

Based on a search of the Environmental Data Resources (EDR) database – a standard practice for environmental investigators – Laton identified forty two industrial facilities in the Pomona industrial corridor participating in industries which State and federal regulators have reported as hazardous waste users engaging in industrial processes that commonly used perchlorate containing materials or products.  (Ex. 1, Fig. 8; Doc. #392-2, p. 56.)  In particular, Laton identified a dozen metal finishing and plating operations in downtown Pomona.  (Ex. 1; Doc. #392-2,

pp. 13-14.) The use of perchloric acid in metal plating operations is "well documented" with appropriate references. (*Id*.) Sodium nitrate was used from the 19th Century until the invention of synthetic nitrogen in common, everyday uses such as flares (for roads and railroads), military explosives, fireworks and in many industrial applications. (Ex. 1; Doc. #392-2, pp. 11-14, 22, 37.)

Even Pomona agrees with Laton on these common industrial uses of perchlorate. Pomona's 2016 "Annual Water Quality Report" lists the uses of perchlorate in "solid rocket propellant, fireworks, explosives, flares, matches, fertilizers, and *in a variety of industries*." (Emphasis added.) This corroborates Laton's testimony regarding the many industrial uses of perchlorate. It is hardly speculative for Laton to consider the same sources that Pomona does for itself.

Laton's report also provides a reasonable foundation for opining that General Dynamics *used* (not just "could have" used) perchlorate at its Pomona plant, as well as many other local businesses. Among other things, Laton relied on an interview with a former General Dynamics engineer who, having worked at that facility for 38 years, stated that "test firing of rocket boosters were conducted" at that plant. (Ex. 1; Doc. #392-2, p. 13.) Pomona's Director of Utilities Henry Pepper agreed with Laton's General Dynamics opinion:

> Q. You also have businesses in industrial – the industrial part of Pomona that used perchlorate, didn't you?
> A. Yes.
> Q. Such as General Dynamics; correct?
> A. Yes.

(Ex. 5; Doc. #392-6, p. 177:11-15.)

The above admission negates the arguments of Pomona's lawyers that Laton's opinions are mere "could have beens." On the contrary, Laton's opinions are grounded on facts and admissions.

///

Pomona's cursory discussion of Laton's alternative sources of perchlorate in section 3.1.2 of his report frequently tortures his wording. For example, Laton's report states sodium chlorate is "a *commonly* used herbicide by the railroads . . . [and] *is known* to contain perchlorate." (Ex. 1; Doc. #392-2, p. 23). The perchlorate hotspot in Pomona matches the main line of Southern Pacific Railroad. Thus, Laton's reasoning that sodium chlorate is a source ignored by Pomona's experts is right on the money. Pomona ignores these words, focusing instead on the phrase "could be" a source of perchlorate. That colloquial use of "could be" must be read in the text of the words "commonly used" and "is known to contain perchlorate." Read in context, they support Laton's testimony that sodium chlorate herbicide is a probable perchlorate source.

Laton supports his additional opinion that the AEP has itself been a contributor to the persistent perchlorate hotspot through several lines of evidence. First of all, despite the lack of perchlorate in up-gradient wells, after more than 20 years of treatment the groundwater near the AEP remains highly contaminated while upgradient areas are virtually free of contamination. (Ex. 1; Doc. #392-2, p. 29). Laton reasons that something local in that area must be the source of the hotspot since all distal areas that flow to the AEP wells contain no perchlorate (or in one instance, perchlorate below MCL). (Ex. 1, Fig. 17; Doc. #392-2, pp. 29, 65.)

Second of all, the physical evidence shows that the waste effluent from the AEP caused by backwashing the ion exchange columns (they are washed free of perchlorate so they can be re-used) contains an elevated level of perchlorate. Multiple samples showed effluent concentrations between 460 and 530 ppb, almost 100 times the MCL. (Ex. 1; Doc. #392-2, p. 20.) Pursuing this information, Laton learned that the waste effluent is being piped over a mile and a half to a brine line through a common sewer lateral initially constructed over sixty years ago made of loosely fitted sections of vitrified clay pipe. (*Id*.) In Laton's experience, such loosely fitted pipe sections (that are neither threaded or otherwise sealed) usually

leak. Thus, Laton had ample foundation to conclude that leaking sewer laterals taking the AEP's waste effluent to the brine line explained the persistent perchlorate hotspot at and immediately adjacent to the AEP. (*Id*.)

Pomona's motion against Laton ignores the fact that perchlorate is commonly found in the soil, as discussed in section 3.1.2.6 "Naturally Occurring Perchlorate." Searles Lake (in the Mojave desert just over the San Gabriel Mountains from Pomona) is the site of a large producer of potash and borax fertilizer "much more likely to have been used by farmers in the Pomona-Ontario basin due to the close proximity and lower costs." (Ex. 1; Doc. #392-2, p. 25.) Naturally occurring perchlorate has been found not only just north of Pomona but also just south as well in San Diego at concentrations up to 59 ppb. (*Id*.) This is a gaping hole in Sturchio's method. None of this is addressed in Pomona's motion.

Laton also appropriately criticized Wheatcraft's lack of scientific rigor in failing to "take into account other sources that could have the same isotopic signature, such as . . . pre-1931 Chilean fertilizer." (Ex. 1; Doc. #392-2, p. 10.) Other evidence established that SQMNA did not import sodium nitrate fertilizer into California until 1931.

Even before Laton took the stand at trial, during Pomona's case in chief ample evidence showed that that sodium nitrate was used in Pomona as fertilizer before 1931 (before SQMNA had any sales in California) and used in multiple industrial uses including gunpowder and munitions. Such evidence included:

(i) Pomona's historical expert Frederick Sundstrom's testimony that Chilean nitrate was used as fertilizer in Pomona from 1888 to 1920. (Ex. 3; Doc. #392-4, p. 170:15-23)

(ii) Pomona's 2007 Consumer Confidence Report ("CCR") announced that the perchlorate in Pomona's groundwater "has been traced to Chilean fertilizer used during the agricultural era here in the Pomona valley over 75 years ago" – that is, before SQMNA was licensed to sell

fertilizer in California. (Ex. 4; Doc. #392-5, p. 173.)

(iii) Henry Pepper, Pomona's Utilities Services Director, testified that the 2007 statement about Chilean fertilizer being used "over 75 years ago" was true. (Ex. 5; Doc. #392-6, p. 178:17-25.)

(iv) Pomona's expert on plant nutrition, Charles Sanchez, testified that Chilean nitrate has been used "in the fertilizer industry[,] for munitions and other purposes." (Ex. 6; Doc. #392-7, p. 182:5-10.)

These are not "could have beens." There are facts and party admissions. On the record presented to this Court on Pomona's 2011 *Daubert* motion, this Court had no difficulty in denying the motion on the merits on January 3, 2012. (Doc. # 198). That denial was re-*affirmed* on May 29, 2015. (Doc. # 304.) With the evidence presented in Pomona's case in chief at trial, the factual foundation for Laton's opinion regarding a non-SQMNA source is even more compelling. Since the appellant court has directed the preparation of a statement of reasons or findings for the denial, this court should oblige.

### III. THE FINDINGS THAT THIS COURT SHOULD MAKE

#### A. The Test under Rule 702 and *Daubert*

The appellate decision in *Pomona II* does not prescribe the exact findings this court should make. Instead, this court was informed that it should provide an "'analysis or explanation' for its decision regarding expert testimony under Daubert." (*Pomona II, supra,* 866 F.3d at 1069.) While extensive findings are not required, in an abundance of caution the Court should consider making findings on the following elements of Rule 702 of the Federal Rules of Evidence and state whether:

(1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education;

(2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

1     (3) the testimony is based on sufficient facts or data;

2     (4) the testimony is the product of reliable principles and methods; and

3     (5) the expert has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702.

*Daubert* suggests four factors that the Court may consider to determine the admissibility of expert opinion evidence: (1) general acceptance in the scientific community, (2) whether the theory can and has been tested, (3) whether the theory has been peer reviewed and published, and (4) whether the known or potential rate of error is acceptable. *Daubert*, 509 U.S. at 593-594. *Daubert* makes clear that the factors it mentions do not constitute a "definitive checklist or test." 509 U.S. at 593. The general acceptance of the DTSC (and related EPA) Guidelines is strong evidence of reliability, as is Laton's 20 years of consulting experience in performing over 100 environmental investigations.

The required determination merely "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592. The reliability test is "flexible" and should be applied based on the circumstances of the case. *Pyramid Technologies, Inc. v. Hartford Cas. Ins.*, 752 F.3d 807, 816-17 (9th Cir. 2014).

The court is not tasked with deciding "whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969-970 (9th Cir. 2013). The court is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Id*. at 969. Challenges that go to the weight of the evidence are for the fact finder, not the trial judge. *City of Pomona v. SQM N. Am. Corp,* 750 F.3d 1036, 1043-44 (9th Cir. 2014) ("*Pomona I*").

/ / /

One of the important uses of expert testimony (such as Laton's) is to show that the opposing experts had made no "effort to rule out other possible causes." *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). The opposing expert "must provide reasons for rejecting alternative hypoetheses . . . and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Clausen v. M/V New Carissa* 339 F.3d 1049, 1058 (9th Cir. 2003).

### B. Findings as to Laton's Qualifications

Laton's qualifications to render opinions as to the source of groundwater contamination are well-established and have not been challenged. Laton is a Registered Professional Geologist and Hydrogeologist in California, and in several other states. He has a Ph.D. in Hydrogeology, and M.S. in Environmental Earth Science, and a B.S. in Earth Science. He is an Associate Professor of Hydrogeology at California State University, Fullerton, and has been actively working as a professional hydrogeologist for over 20 years. He has performed over a hundred environmental investigations. (Ex. 1; Doc. #392-2, pp. 7-8.)

### C. Findings as Whether Laton's Opinions Are Helpful to the Jury

While Pomona would prefer to disarm the defendant's main expert, as this court recognized the issues in this case present a classic "battle of the experts." Juries do not know hydrogeology and contaminant transport analysis from their everyday experience. Laton's opinions regarding alternative sources of perchlorate in Pomona's groundwater were helpful to the jury in the last trial, and will be helpful in the next one. The theories of plaintiff's expert s are technical and complex, and there is certainly a risk that Sturchio's opinions might confuse the jury. *Daubert,* 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.") Laton balances the playing field.

/ / /

Laton's opinions will help the jury understand the evidence. Laton assessed the perchlorate contamination in Pomona in a comprehensive manner to identify a number of crucial loose ends that were ignored by Pomona's experts. He identified and mapped Pomona's Industrial Corridor, where the AEP wellfield is located, and identified potential sources of perchlorate there, including fertilizer use before 1931 and industrial use of sodium nitrate and perchloric acid.

Laton's analysis will be extremely helpful to the jury in that he is the only expert to actually consider the perchlorate contamination concentrations within the "tear drop" of Wheatcraft's zone of influence.

Laton was not required to prove which of the several potential sources was the actual source of the persistent hotspot in the AEP wellfield. It is enough that Laton shows the source is probably not SQMNA. *Stanley v. Novartis Pharms. Corp.*, 11 F.Supp.3d 987, 1001 (C.D. Cal. 2014) ("[A]n expert need not rule out every potential cause in order to satisfy *Daubert*," as long as the expert "address[es] obvious alternative causes and provide[s] a reasonable explanation" for responding to the opposing expert's opinions); *Pyramid*, 752 F.3d at 816 ("Although Spiegel did not say with certainty that the humidity from the flood caused damage to Pyramid's inventory, a jury could reasonably infer causation from Spiegel's report and Pyramid's other evidence."). "A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat. Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable." *Pomona I*, 750 F.3d at 1049.

### D. Findings as to the Threshold Reliability of Laton's Opinions

Laton followed well-accepted professional standards for an environmental site assessment by developing a Site Conceptual Model to identify all potential sources of perchlorate contamination in Pomona's groundwater, and then by further investigating the potential source to identify the likely cause or causes of the contamination. His approach is regularly used and reliable, as it is based on DTSC's

1  Guidelines.  (Ex. 1; Doc. #392-2, p. 10.)

2       Laton followed standard practice by obtaining an Environmental Data Resources ("EDR") database report to identify the types of businesses that commonly use perchlorate or sodium nitrate in their operations.  An EDR report is "designed to assist parties seeking to meet the search requirements of EPA's Standards and Practices for All Appropriate Inquiries (40 CFR Part 312), the ASTM Standard Practice for Environmental Site Assessments (E1527-05) or custom requirements developed for the evaluation of environmental risk associated with a parcel of real estate."  (Ex. 1, Ex. D; Doc. #392-2, p. 161.)  Data for the EDR Report is compiled from public records filed with federal, state and local agencies.  (Ex. 1; Doc. #392-2, p. 11.)

     Laton mapped the proximity of these sites to the AEP wellfield and its capture area were mapped, and considered the hydrogeology (groundwater flow rates and direction were considered) and pumping impacts. After evaluating this information (rather than just a single line of evidence as was done by Sturchio), Laton's work led him to the conclusion that the historic orchards were unlikely to be the source of the contamination because there was simple no perchlorate coming from them.  Instead, the persistence of a hot spot in downtown Pomona suggests the likelihood of  a point source.  Leaking laterals to the brine line from the AEP is one plausible line of reasoning supported by elevated concentrations of perchlorate in the AEP's effluent. Other point sources such as industrial sources also cover the evidence; however, a distal orchard source does not.

     Expert opinion testimony based on SCM methodology has been admitted and relied upon in numerous environmental cases. See *N. States Power Co. v. City of Ashland*, No. 12-cv-602-bbc, 2015 U.S. Dist. LEXIS 49387, at 14-15 (W.D. Wis. Apr. 15, 2015) ("Plaintiff has not shown that Patrick used an improper method for his conceptual site model or that he lacked an adequate factual foundation for his findings."); *Plainview Water Dist. v. Exxon Mobil Corp.*, 856 N.Y.S.2d 502 at *20,

*55 (Sup. Ct. Nassau Co. 2008), *affirmed*, 888 N.Y.S.2d 521 (2009) (NYSDEC site conceptual model showed MTBE beneath defendants' properties does not pose a threat to plaintiff's wells); *Newark Group, Inc. v. Dopaco, Inc.*, No. 2:08-cv-02623-GEB-DAD, 2010 U.S. Dist. LEXIS 40150, at *16-17 (E.D. Cal. Apr. 1, 2010); *Liss v. Milford Ptnrs., Inc.*, No. HHDX07CV044025123S, 2011 Conn. Super. LEXIS 906 (Apr. 11, 2011) (finding defendant's expert's conceptual site model refuted plaintiffs' theory that defendant contaminated plaintiffs' property).

Laton's opinions are not inadmissible speculation. "Trained experts commonly extrapolate from existing data." *Pomona I*, 750 F.3d at 1049. For a qualified expert, lack of certainty is not the same thing as guesswork. *Primiano v. Cook*, 598 F.3d at 565 (9th Cir. 2010). "Certainty is an unreasonable expectation in the realm of expert opinion. [An expert's] use of the conditional 'could' in expressing her conclusion is neither unusual nor disqualifying as to her testimony … Experts ordinarily deal in probabilities, in 'coulds' and 'mights'." *United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir. 1993) (citations omitted). Such issues go to weight and credibility, not admissibility. *Stanley*, *supra,* 11 F.Supp.3d at 1001.

### E. Laton Reliably Applied the Relevant Principles and Methods to the Facts at Hand

Laton's application of the SCM methodology and his investigation of the facts of this case provides a reliable basis for his opinions. Laton identified and explained the sources of his information, including the EDR database search, witness interviews, documents from the EPA, Department of Defense and others that identified industries that commonly used sodium nitrate and/or perchlorate. Laton's reliance on data from Wildermuth Environmental and the State of California regarding perchlorate levels in groundwater in the well capture zone was reasonable. Laton demonstrated that this data shows the absence of perchlorate "upstream" from the AEP Wells, and identified alternative point sources of perchlorate, including the laterals to the brine line, that Pomona's experts admitted exist, yet did not rule out.

Hydrogeology expert witnesses frequently use the same methods as Laton in tracing the source of chemicals by following the path of groundwater, and examining historical information as to uses of the chemical in the impacted area See, e.g., *Dep't of Toxic Substances Control v. Technichem, Inc.*, No. 12-cv-05845-VC, 2016 U.S. Dist. LEXIS 33379, at *4-5 (N.D. Cal. Mar. 15, 2016) ("Gallagher's testimony is premised on straightforward ideas: for example, that PCE released into soil will disperse outward from the point of release, and that the absence of PCE in groundwater 'upstream' from a site suggests that groundwater did not carry PCE into the site."); *Tyco Thermal Controls LLC v. Redwood Industrials*, No. C-06-07164-JF, 2010 U.S. Dist. LEXIS 47019, at *37-38 (N.D. Cal. Apr. 15 2010) (admitting opinions as to the source of PCBs, where opinions were supported by historical information, environmental data from the Site and a review of aerial images); *Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*, 622 F. Supp. 2d 918, 926-27 (N.D. Cal. 2009) (expert opinion that adjoining property was the source of PCE was properly based on a "process-of-elimination method" where the work was grounded in a defensible scientific methodology with factual support).

Laton's criticism of Pomona's experts' failure to investigate all potential sources, and his opinions regarding the source of the contamination, are relevant and reliable, particularly in light of Pomona's experts' admission that Sturchio's method doesn't age date perchlorate or distinguish industrial from agricultural uses of sodium nitrate. His work, following well-accepted methods, identified alternative sources of perchlorate that fall squarely within the inherent limitations of Sturchio's methods, namely the pre-1931 applications of fertilizer and industrial uses of sodium nitrate. Laton's alternative explanation of the leaking lateral to the brine line as the source of the perchlorate in the AEP wellfield accounts for the non-detection of perchlorate in the historic orchard areas. His opinions fit the facts, and his opinions make good sense.

/ / /

4823-7515-5803.1

18

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER MAKING FINDINGS TO SUPPORT THE ADMISSIBILITY OF DR. LATON'S TESTIMONY

## IV. CONCLUSION

SQMNA respectfully requests that the Court issue findings in support of its conclusion that Laton's so called "alternative source" opinions are sufficiently reliable to be considered by the jury under the court's gatekeeper function under *Daubert*.

Respectfully submitted,

DATED: February 9, 2018    LEWIS BRISBOIS BISGAARD & SMITH LLP

By:    */s/ R. Gaylord Smith*
R. GAYLORD SMITH
MICHAEL K. JOHNSON
Attorneys for Defendant SQM NORTH AMERICA CORPORATION

4823-7515-5803.1

19

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER MAKING FINDINGS TO SUPPORT THE ADMISSIBILITY OF DR. LATON'S TESTIMONY